UNTITED STATES DISTRICT COURT

WESTERN DISTRICT OF NEW YORK                                      .

ROXANNNE WILLIAMS, Individually, as Administratrix

of the Estate of HAYDEN BLACKMAN, Deceased and as parent

of infant T. R.

|  |  |  |
|---|---|---|
| | Plaintiff | FIRST AMENDED VERIFIED COMPLAINT |
| | | 13-cv-6152L |
| V | | |

CITY OF ROCHESTER, ROCHESTER POLICE DEPARTMENT, RANDY BOOK, AND MATTHEW WILLIAMSON,

         Defendants

_____.

.

Plaintiff, Roxanne Williams, individually, on behalf of the Estate of Hayden Blackman, and on behalf of her infant daughter T. R. by and through her attorney E. Robert Fussell as and for her first Amended Verified Complaint alleges upon information and belief as follows:

1. Plaintiff Roxanne Williams (hereinafter referred to as "Roxanne" or "plaintiff") is and was at all times mentioned herein a resident of the City of Rochester, New York.

2. Roxanne is the surviving spouse of decedent Hayden Blackman. (Hereinafter referred to as

   Hayden)

3. On or about December 15, 2011, Roxanne was appointed the Administratrix of the Estate of Hayden Blackman by the Monroe County Surrogate's Court.

4.  At all times mentioned herein, Hayden resided with Roxanne in the City of Rochester, New York. Defendant City of Rochester is a municipal corporation formed in and under the laws of the State of New York.

5.  At all times mentioned herein defendant Rochester Police Department (hereinafter referred to as "RPD") is, and was a department and/or subdivision of the defendant, City of Rochester. At all times mentioned herein defendants Randy Book, and Matthew Williams were, and remain, police officers employed by the RPD.

6.  Each of the individually named defendants are sued individually and in their official capacities.

7.  At all times mentioned herein the individually named police officers were acting under color of state law and on behalf of the RPD.

8.  Plaintiff timely filed a Notice of Claim with the City of Rochester pursuant to General Municipal Law § 50-e.

9.  More than 30 days have elapsed since the filing of said Notice of Claim and plaintiff's claims have not been compromised or settled by defendants.

10. The defendants, at the times and places indicated, were acting under color of law of the State of New York and deprived plaintiffs of the privileges and immunities guaranteed to every citizen of the United States by the United States Constitution including, but not limited to, Amendment IV, Amendment V and Section 1 of Amendment 14, and by reason thereof this Court has jurisdiction over the Plaintiffs' claims for violations of their Federal Civil rights, pursuant to the provisions of 42 U.S.C. 1983, and has jurisdiction for all New York State claims set forth in this Complaint.

BACKGROUND

11. On October 13, 2011 Hayden was 43 years old. He had no criminal record. He was a peaceful, gentle man. He was employed as a groundskeeper at Jasco Tool and Die in Rochester, and had been so employed for approximately three years. He'd married Roxanne in July 2011, after having lived with Roxanne, her son S. R, who was 16 years old on 10-13-11, and her daughter T. R, who was 12 years old on 10-13-11. The four had lived together for approximately a years and four months at 181 Columbia Avenue Rochester prior to 10-13-11.  Roxanne has worked at Rochester Regional Health Insurance as a secretary, since 1997. On 10-13-11 Officer Randy Book was 25 years old, had been on the Rochester

Police force for 4.5 years, and had received training as a rifleman in the Marines Corps. As of 10-13-11 S. R. had had problems with academic learning difficulties, anger management and behavioral problems. The Rochester City Police knew that S. R. suffered from behavioral, anger management problems, as they had made a Mental Health arrest of S. R. in about August 2011.  (A member, or members, of the RPD made the decision to make a Mental Hygiene arrest of S. R., rather than a conventional criminal arrest.)


OCTOBER 13, 2011

12. October 13th was Roxanne's birthday. She and Hayden celebrated her birthday by going to the Renaissance Lounge, where they consumed alcoholic. Before they left their home at 181 Columbia Avenue, upstairs apartment; they told T. R. where they were going that evening. Before leaving home Roxanne gave T. R her cell phone to use to call in case of an emergency. Roxanne didn't tell S. R. where they were going because S. R. was not at home at that time. Roxanne and Hayden walked to the Renaissance at about 7:15 pm.

13.   While T. R. was home by herself, her brother S. R. came home. They argued. T. R. called 911, at 10:52 pm, telling the dispatcher that S. R. was threatening to stab and punch her. Police were dispatched to the home. Including, on information and belief, officers, Timothy Campe, Jordan Bracey, Kenneth Pinkney and Daniel Zimmerman. Those officers spoke with T. R. and S. R. They found no knife on S. R., who told the police he was leaving his home, and going to go to a friend's house. An officer, accepting S. R's assertion, told T. R. that S. R. was going to a friend's house and would not bother her again. On information and belief the officers left the home at about 11:05 pm, after telling S. R. to leave his sister alone. None of these officers made any attempt to contact Roxanne or Hayden to inform them about the conflict between S. R. and T. R., or that S. R. told them he was going to a friend's home. Thereafter, S. R, despite his assertions to police, did not leave the house. S. R. and T. R. continued to argue. At about 11:20 p.m. Hayden and Roxanne returned home. After the parents returned home, S. R. told them he was going to sell some of T. R's electronic devices. During the argument that followed, a frustrated, angry Hayden called 911, (on information and belief at 11:35 pm) and spoke to the dispatcher. Hayden then handed the phone to T. R. who spoke, for the second time in less than an hour, to the dispatcher. T. R. told the dispatcher that her brother was still a problem, and, in response to the dispatcher's question, she said there were no weapons, drugs or alcohol involved. The dispatcher told T. R. she would send officers back to their address. The dispatcher failed to ask either Hayden or T.R. for the identity of the man who spoke to her. After that call ended S. R. announced he was going to take the flat TV, and began to unplug it. Hayden and Roxanne held the TV to prevent S. R. from taking it, and S. R. responded by punching

3

Hayden in the face. Hayden then went into his bedroom and came back out with an open standard pocket knife that had a 3.5" blade, and approached S. R. with it in his hand.

14. After speaking with Hayden and T.R, the dispatcher dispatched officers Matthew Williamson and Randy Book to the Blackman home. Book arrived at the home at 11:37 pm, a minute after Williamson arrived. Williamson was assigned the role of 25 year old Book's back up. The dispatcher failed to tell the officers that the brother was the problem

During the next minute all of the following took place:

> Book and Williamson heard arguing coming from the upstairs apartment. They rang the doorbell. T. R. came downstairs to the door. The officers asked her what was going on and T. R. told them that her brother and step-father were bumping heads. The officers asked T. R. if they had a dog, and she told them "no". Then T. R. went up the stairs with Book following behind her and Williamson following Book. T. R. went into the apartment. But Book stayed outside the door leading into the apartment, and saw S. R. standing to Book's left and Hayden standing to Book's right holding the pocket knife. Book then saw Hayden turn to his right, away from S.R. and away from Book. Book ordered Hayden to "drop the knife" Hayden started to walk away from Book, and Book crossed the threshold into the apartment. Book immediately repeated this order. Hayden then turned to his left, (counter-clockwise in Book's direction, and towards a table located past Book's body, where Hayden could have placed the knife had he completed his turn). But before Hayden completed his counter-clockwise turn towards the table, and immediately after issuing his second order to "drop the knife" Book began firing at Hayden with his .45 caliber weapon. (Book admits he used his handgun because neither he nor Williamson had tasers, and that neither of them were taser certified). One bullet penetrated Hayden's lower right chest and traversed his body from right to left with no significant front to back deviation. One bullet penetrated the back of Hayden's right shoulder, another bullet penetrated Hayden's right/lower back and heart. Another bullet penetrated Hayden's left lower back and heart. One of the bullets went to Book's left, into a wall, (at the time of the shooting T. R. was standing about as many degrees to Book's right as the bullet in the wall was to Book's left). As Hayden was struck by bullets his body made a 360 degree counter clockwise turn. After Hayden completed the turn he stood facing Book, who fired the last bullet towards Hayden. Hayden then fell to the floor. At 11:38 p.m., one minute after Book arrived outside the Blackman house, Williamson called the dispatcher and announced, "Shots fired. Susp doen"

4

15.  After the shots were fired Book and Williamson handcuffed Hayden, S. R, T. R. and Roxanne. They forced them to lie on the floor. (Book and Williamson un-cuffed Hayden after instructed to do so by a paramedic.)

According to RPD Technician Dapson, the dining room table was moved from its original position to enable emergency medical personnel to administer treatment to Hayden, and that the pocket knife was found on the dining room floor, east of the dining room table As per Investigator Houlihan the knife was located about 5' from Hayden in the center of the dining room floor.

16. Hayden was then transported to Strong Memorial Hospital where he was pronounced deceased at 12:30 am the next day, October 14, 2011.

THE COVER-UP

17. RPD officers then placed Roxanne, S. R. and T.R. in three separate police cars, while handcuffed. At 1:40 am Roxanne, while she was still seated and handcuffed in a police car, gave investigator Salvatore written consent to search her apartment. Police then transported Roxanne, T. R. and S. R in handcuffs to the Public Safety Building in three different police vehicles. After arriving the three were kept apart, secured in three different rooms and interrogated. Roxanne was interrogated by Investigator Houlihan. At the conclusion of her interrogation, she signed a handwritten, printed statement. (Roxanne did not write the statement**.**) At 2:50 am. Investigators Salvatore and O'Brien interrogated T. R. at the Public Safety Building, and at 3:35 a.m. Salvatore and O'Brien interrogated S. R., also at the Public Safety Building. The children's statement s were typed. Roxanne was not allowed to see her children until they were all released at about 5:30 a.m. on 10-14-11, almost six hours after the shooting took place. The three were released after they signed the written statements of the events of 10-13-11. (Apparently none of the interviews were recorded by audio or video.)

18. R.P.D. Lieutenant Laura Grande was assigned the role of debriefing Book. As soon as Book mentioned he'd committed a shooting, she immediately stopped debriefing Book, and refused to perform a prompt, competent, necessary investigation of the homicide, (Hayden's death was described as a "homicide" on his death certificate). Lieutenant Grande then began to interrogate Williamson, but as soon as he addressed the shooting by Book, she immediately terminated that interrogation as well. At 6:15 am

on 10-14-11 Investigators Salvatore, and O'Brien told Book they wanted to speak to him about the shooting that had taken place the previous night, but Book responded saying that he was preparing to leave, and that he did not want to speak to them at that time, and that he was going to speak with his attorney, Lawrence Andolina, and would sit down with Salvatore and O'Brien the following Monday or Thursday.  (Despite being the killer he was not handcuffed, detained and/or encouraged to give a statement, as were mere witnesses Roxanne, T. R. and S. R., who clearly had done nothing indicating they had committed any crimes or other violent acts.)

19. On 10-19-11, six days after the shooting, Salvatore and O'Brien met with Book and Andolina at attorney Andolina's office. (Apparently this interview was not recorded by audio or video.) At that time Book gave a version of the events of the shooting. Book also gave a handwritten statement on that date, describing the events of 10-13-11. He claimed that when first saw S. R. he heard a deep voice (Hayden did not have a deep voice) say something to the effect, "I'm going to stab you in the face" and then saw Hayden holding the knife. (Please note that no one else present, including Williamson, heard that purported utterance, or any one like it)  Crucially, in this extensive, three page handwritten version, Book does **not** claim that Hayden moved towards Book before Book began to shoot him.

20. On 10-28-11 Sgt. M. Giaconia wrote up an incident report claiming Hayden committed Menacing 2nd – a misdemeanor, on Book, the purported victim, but brought no charges against Book for the homicide he'd inflicted on Hayden

21. On 10-31-11, twelve days after Book wrote his 10-19-11 statement, and eighteen days after the killing, Book testified at a R. P. D. Professional Standards investigation of his use of Deadly Physical Force. In this more self- serving version, made outside the presence of his attorney, Book repeatedly and extensively embellished his story of the incident. Some of those embellishments are as follows:

> He claimed for example, that Hayden had said something, along the lines of, "I'll stab this knife in your fucking face" (adding the word "fucking") He described the 3.5" bladed pocket knife as a "large knife" (Please note none of the four questioners asked Book to describe more specifically Book's meaning of his term "large" knife). He added the assertion that when Hayden was facing Sterling, before Hayden turned away from Sterling that, the knife, "was very close to his throat". (He didn't say how close) He noted that Hayden was "very large" … "at least 6' 4", 6' 5"" and weighed in the "300 pound category." (In reality Hayden was 5' 9.5" tall and weighed 243.5 pounds) And, most importantly, Book added that, as Hayden, "stepped toward me I began pulling

6

the trigger" (By this time, 18 days after the killing, Book had to have learned that he needed to testify that Hayden had "stepped towards him" if he had any chance of avoiding disciplinary consequences, let alone a criminal indictment for homicide.)

Book then admitted that when he fired Hayden was directly at his 12:00, and that T. R. was at his

2:00. (About as close to the right of Book's line of fire, as the spot on the wall hit by one of Book's bullets was to Book's left). Book also noted that after he shot Hayden and after Hayden spun around in a counter clockwise 360 degree turn, Hayden still had positive control of the knife, and was still standing, and, Book admits, that he then, "began to pressing on the trigger again".  Book did not mention that three of his bullets hit Hayden in the back, or that one bullet crossed his lower chest from right to left.

When asked, during the investigation, why he didn't, "Shoot him in the arm?" Book responded, "We were taught in the academy that you're taught to shoot center mass." (He was very successful in this endeavor as two of his bullets pierced Hayden's back and heart)

22. The recommended findings of the Professional Standards investigation included the following - It accepted Book's self- serving statements, while rejecting those of all the other people who were present during the shooting. They found, for example that Hayden said "I'll stab this knife in your fucking face" even though no one else present, including officer Williamson, heard such a statement. And they accepted Book's statement that Hayden "stepped towards" Book with the knife, despite the fact that Book did not make that claim in his 10-19-11, detailed, three page statement, and that no one else in the room, claimed to have seen Hayden make that step forward. Also the investigators accepted Book's reliance on his training at the academy as justification for the use of deadly force, specifically Book's version of  the 21 foot, and center mass rules, and ignored  both Penal Law, section 10 and RPD Rule 340, cited in the transcript of the investigation, when finding that Book should be exonerated for the killing, based upon Book's mere "perception," not his "reasonable  belief", that deadly force was "necessary" to protect his life and that of others, such as officer Williamson and S. R. (Please note the 21 foot rule applies when the officer's gun is in his holster, not when his gun is already in the officer's hand, and the officer is poised and ready to shoot his victim, with his gun pointed directly at the chest of the subject, the gun's safety is off, making the weapon ready to fire instantaneously, and the officer's entire body is posed to shoot instantly, as Book claims were the circumstances existing immediately before he commenced firing five shots at Hayden.)


23.    Plaintiffs endured damages as a result of their mistreatment by defendants, including the following:

Hayden suffered the loss of his life, and pain and suffering from the time of the assault upon him by Book, until the moment of his death. Roxanne suffers from, not only the loss of her beloved husband, and the joy of her life with him, but also the loss of the financial and other benefits she would have obtained had her husband Hayden survived to act as her husband and financial resource for the balance of her life (and through Social security benefits derived from Hayden if he had led a normal working life, and predeceased her through a natural death). Roxanne and TR both suffered from, now suffers from, and will permanently suffer from pain and suffering, including – the anger, fury, shock, fright and depression – i.e. the terror – of seeing and hearing Book assault, batter and kill Hayden, (T. R.'s terror was enhanced as she stood close to the line of fire directed at Hayden) and thereafter when members of the RPD battered Roxanne, T. R. and S. R., by handcuffing them, forcing them to lie on their apartment floor, then forcing them, while enduring the extreme emotional pain of the events that had just transpired, to go down their stairs, and placed into police vehicles while shackled, and thereafter driving them to the Public Safety Building where they were kept apart from each other and interrogated; the deprivation of their civil rights, and suffered from the imposition of other torts committed by defendants,  as described heretofore in this Complaint. (During this time members of the RPD deceived Roxanne by telling her Hayden was alive, making her eager to sign her statement and leave the Public Safety Building to visit him in the hospital, when in fact they knew he was deceased) Roxanne and T. R. suffer from, and will continue to suffer from, for the remainder of their lives, the fear of meeting with, and/or dealing with members of the City of Rochester Police who have terrorized, battered and falsely imprisoned them, and interfered with their constitutional rights as described more fully in the portion of this Complaint that sets forth each subsequently described cause of action. On information and believe Roxanne and T. R. suffer from, and will continue to suffer for the rest of their lives, from emotional pain and suffering, which is aggravated when observing police (members of an institution these defendants  have justifiable reason to hate), and police vehicles, and from hearing police sirens and other noises emitted by police**.**

AS AND FOR A FIRST CAUSE OF ACTION AGAINST THE DEFENDANTS FOR DEPRIVATION
OF PLAINTIFFS' DECEDENT'S CONSTITUTIONAL RIGHTS PURSUANT TO 42 USC 1983

24. Plaintiff repeats and re-alleges all allegations made heretofore in this Amended Complaint.

25. The individual defendants Book, and Williamson, were acting under color of state law in their
capacities as officers of the RPD when all the events described in this Complaint took place.

26. Hayden's right to life and liberty, due process and equal protection, pursuant to the Fourteenth and
Fourth Amendments of the United States Constitution were violated when defendant Book exerted
excessive force upon Hayden by shooting him four times, and thereafter, when Hayden was allowed to
die, without immediate assistance from Book, Williamson or other employees of the RPD. Also
Williamson did nothing to stop Book from shooting Hayden. Furthermore the treatment of plaintiff's
decedent constituted a violation of the Eighth Amendment prohibiting cruel and unusual punishment.
(Based on the assertion that plaintiff's decedent committed the crime of Menacing Second Degree, a
misdemeanor, against Book). Furthermore the defendants' behaviors set forth in this Amended Complaint
were performed as a result of evil motives or intent, and constituted reckless and callous indifference to
plaintiff's decedent's federally protected rights, entitling plaintiff's decedent to punitive damages, against
the institutional defendants, and Book.

27. The illegal, excessive conduct committed by defendant Book, with the support of defendant
Williamson, caused the decedent's death and caused decedent to endure approximately 52 minutes of
conscious pain and suffering prior to his demise, and to all damages addressed in this Amended
Complaint.

AS AND FOR A SECOND CAUSE OF ACTION AGAINST THE INDIVIDUAL DEFENDANTS FOR
DEPRIVATION OF PLAINTIFFS' CONSTITUTIONAL RIGHTS PURSUANT TO 42 USC 1983

28. Plaintiff repeats and re-alleges all allegations made heretofore in this Amended Complaint.

29. The Constitutional rights of liberty of plaintiff Roxanne, and her daughter infant T. R. were violated when defendants battered them by handcuffing them and forcing them to lie on the floor of their apartment, then by transporting them in police vehicles  to the Public Safety Building, and then maintaining them apart from each other and from S. R. and interrogating them about the shooting of plaintiff's decedent for hours, when they were also falsely imprisoned, and the subjects of excessive force. Their violated rights included, but were not limited to, plaintiffs' constitutional rights of liberty, equal protection under the law, and due process. Among the Amendments to the United States Constitution that were violated were the Fifth and Fourteenth. Those plaintiff's rights to due process and equal protection were further violated when defendants, (at the same time they violated Roxanne and T. R's rights as noted above) neither interrogated, incarcerated, nor handcuffed white officer Book who was clearly the killer. (Roxanne, and T. R, are African American, as was Hayden)

30. Plaintiffs Roxanne and T.R suffered the damages described heretofore in this Complaint as a result of the defendants' violations set forth in this Cause of Action.

AS AND FOR A THIRD CAUSE OF ACTION AGAINST THE INDIVIDUAL DEFENDANTS FOR DEPRIVATION OF PLAINTIFFS' CONSTITUTIONAL RIGHTS PURSUANT TO 42 USC 1983

31. Plaintiff repeats and re-alleges all allegations made heretofore in this Amended Complaint.

32. Plaintiffs' protections, pursuant to the Fifth and Fourteenth Amendments of the Federal Constitution to due process, and plaintiffs' protections of equal protection pursuant to the Fourteenth and First Amendment rights to petition the government for a redress of their grievances, were all violated by the defendants. The violation of plaintiffs' rights of equal protection were violated by defendants' cover up and protection of the institutional defendants and the individual defendants from redress for their mistreatment of Hayden, while at the same time, mistreating Roxanne and T. R. despite the fact that it was patently obvious that neither Roxanne nor T. R were guilty of any wrongdoing. Furthermore, the plaintiffs' rights to due process were violated, by defendants' failures to properly investigate and

prosecute Book, and by their mistreatments of Roxanne and T. R. which included defendants' failure to properly, promptly and objectively investigate the shooting and killing of decedent. These misdeeds included engaging in conspiratorial efforts to cover up the events surrounding Hayden's homicide. The defendants' failure to properly investigate the shooting and killing of plaintiff's decedent impeded and denied plaintiffs their First and Fourteenth Amendment property right of "petitioning for a governmental redress of grievances." Defendants created a cover up which denied, and continues to deny, plaintiffs' right of equal protection.

Defendants through their cover up of the facts set forth in this Complaint prejudiced plaintiff's rights of access to redress in this court and in state courts, and resulted in the obstruction of justice by defendants

Also the defendants failed to fulfill their duty to enforce the laws equally and fairly against plaintiffs, and to comply with due process. They did this by covering up the facts demonstrating the criminal, homicidal nature of the actions of officer Book, when killing plaintiff's decedent.

33. The plaintiffs' damages as a result of the violations set forth in this Cause of Action, include the damages described in this Amended Complaint, and the costs of the plaintiffs' efforts to seek justice through the Courts and otherwise, for the violations of their rights as described in this Cause of Action.

AS AND FOR A FOURTH CAUSE OF ACTION AGAINST THE INDIVIDUAL DEFENDANTS FOR DEPRIVATION OF PLAINTIFFS' CONSTITUTIONAL RIGHTS PURSUANT TO 42 USC 1983

34. Plaintiff repeats and re-alleges all allegations made heretofore in this Amended Complaint.

35. The defendants violated the plaintiff's decedent's Eighth Amendment right to be free from the infliction of cruel and unusual punishment, when Book shot and killed plaintiff's decedent, presumably in response to the purported claim that Hayden committed Menacing 2nd degree, a misdemeanor, against Book.

36. Plaintiffs' decedent suffered the damages described heretofore in this Complaint as a result of the defendants violations set forth in this Cause of Action, including the loss of his life and the pain and suffering he endured between the time he was assaulted by Book and the moment of his death.

11

AS AND FOR A FIFTH CAUSE OF ACTION AGAINST THE INSTITUTIONAL DEFENDANTS
FOR DEPRIVATION OF PLAINTIFFS' CONSTITUTIONAL RIGHTS PURSUANT TO 42 USC 1983

37. Plaintiff repeats and re-alleges all allegations made heretofore in this Amended Complaint.

38. On information and belief, the individual defendants performed each and every action set
forth in this Complaint pursuant to an official policy (or official policies) of the institutional
defendants, and/or pursuant to its governmental customs. These policies and/or customs include,
but are not limited to: (1) the policy and/or custom of shooting a person when the shooting
officer claims he  feels threatened, without regard to the reasonableness of the basis for that
feeling, (2) the implementation of the 21 foot rule allowing, or requiring, officers, such as Book, to shoot
under conditions involving the extreme likelihood that death will result to any person holding a knife
located within 21 feet of an officer who the officer subjectively feels constitutes a threat to anyone, (3) the
policy and/or custom of shooting "center mass" into the body of any person holding a knife, standing
within 21 feet of an officer who the officer subjectively feels constitutes a threat, (4) the policy and/or
custom of shooting to kill when having the mere perception, whether reasonable or not, that a knife holder
creates a danger to another person, (5) the policy and/or custom of using of deadly force even when the
use of non-deadly force is reasonably adequate to prevent serious injury to the officer or others, (6) the
policy and/or custom of failing to employ a reasonable, thorough  or prompt investigation, of an officer,
immediately after that officer kills a person, (7) the policy and/ or custom, of covering up any potentially
illegal behavior committed by an officer,  after the officer has killed a person, (8) the policy and/or
custom of violating the rights of people who witness the misdeeds of an officer of the RPD, by
handcuffing,  incarcerating, interrogating or otherwise mistreating such witnesses, (9) the policy and/or
custom of failing to arrest, interrogate or otherwise investigate an officer when there is reasonable cause
to suspect or believe that said officer has committed homicide, (10) the policy and/or custom of
repeatedly shooting a person the officer subjectively feels is a danger until the person is dead, or

12

virtually dead, (11) the policy and/or custom of refusing to investigate a domestic confrontation to discover the nature of its circumstances, before commencing to shoot a person at the scene, (12) the policy or custom of failing to utilize proper de-escalation methods and/or peaceful conflict  resolution methods when responding to 911 calls for domestic matters (13) the policy and/or custom of having a dispatcher fail to obtain the identity of the person who called 911, and to follow up by failing to notify an officer sent to the scene of a domestic confrontation, of the identity of the person who'd called 911 requesting police assistance, (14) the policy and/or custom of police responding to the scene of a domestic confrontation, before attempting to discover the identity of the person who had called 911 requesting police assistance, (15) the policy and/or custom of failing to interrogate a police officer immediately after the officer has shot and killed an individual, and to otherwise fail to engage in a prompt, thorough investigation of the incident, and (16) the policy and/or custom of engaging in "cover ups" (conspiratorial or otherwise) when an officer has killed a person, (17) the policy and/or custom of failing to comprehensively deal with a domestic complaint made by one adolescent sibling against another, by accepting the accused's assertions, and failing to protect the threatened sibling, by failing to contact the parents or by failing to engage in other appropriate efforts to protect the threatened sibling, and failing to protect the threatening sibling from himself, (18) the policy or custom of placing a younger officer (Book) in the position to directly confront a potentially emotionally stressful domestic situation, instead of placing an older more mature officer (Williamson) in a position to directly confront the situation –Book's pre frontal cortex may not have been fully developed at the time of the shooting, (19) the policy or custom of sending officers to stressful domestic confrontations without tasers and training in the use of tasers or other neuromuscular incapacitation devices, (20) the policy or custom of  engaging in policies that reduce opportunities for positive interaction between officers and members of the community, such as failing to divide the City into several small patrol divisions, instead of two large ones, (21) the policy or custom of failing to utilize methods to build relationships between police and members of the community, such as by putting police on beats that encourage their interaction with the people the police are required to protect and to serve; and requiring police to attend community and neighborhood meetings.(Had such policies been enacted before the meeting of Book and Hayden, the responding officers would have known Hayden and S. R., personally or at least by reputation,  and realized that Hayden was a peaceful man dealing with a troubled step-son, and

13

would not have killed Hayden.), (22) the policy or custom of failing to record by video or audio the interrogations of witnesses such as Roxanne, T. R., S. R., Book and Williamson, (23) the policy or custom of failing to place members of the public on the  Professional Standards investigating panel, (24) the policy or custom of allowing the members of the Professional Standards Investigating panel to overlook evidence of malfeasance by officers, (26) the policy or custom of failing to teach its employees, such as Book and Williamson, that it is their duty as officers to hold the highest regard for the sanctity of human life and that the application of deadly force is a measure to be employed only in the most extreme circumstances after all lessor methods of force have failed or could not be reasonably employed and that the primary duty of all officers is to preserve human life. (25) the policy or custom of failing to teach officers such as Williamson that it is the duty of every officer present at the scene of a use of force incident to either stop or attempt to stop another officer from using force when force is not required, (26) the policy or custom of failing to teach officers, such as Book, that officers are to use deadly force only when they must do so to protect themselves, (27) the policy or custom of failing to engage in proper crisis intervention techniques when confronted with an angry, frustrating, domestic matter, one aggravated by a 16 year old dealing with anger management problems and an intoxicated, frustrated step-father. (28) the policy or custom of failing to teach white officers like Book about unconscious bias, especially racial bias, and how to recognize and overcome such biases, (29) the policy or custom of engaging in training techniques that over emphasize the "worst case" scenarios, inculcating a "no-win" attitude in the minds of officers such as Book, encouraging the over-reactive use of excessive, deadly force, (30) the policy or custom of not utilizing a single investigative unit devoted to criminal investigative criminal investigations of all incidents where deadly force was applied by an officer, (31) the policy or custom of not developing and/or utilizing a manual for conducting investigations of officer involved shootings, (32) the policy or custom of not utilizing properly trained force investigation teams when conducting investigations of officer involved shootings, (33) the practice or custom on not video recording the crime scene, (34) the practice or custom of not developing or utilizing a standard checklist of items constituting a public safety statement that transporting supervisors must obtain from an officer involved in a shooting, (35) the practice or custom of not having the transporting supervisor conduct a walk- through of the scene of a shooting by an officer, with the officers who were present at the scene of the shooting, (36) the practice or custom of not interviewing an officer present at an officer conducted shooting, immediately after the shooting takes place, (or if it is not possible to conduct that interview immediately after the shooting takes place) to conduct that interview as soon as possible after the shooting takes place, (37) the practice or custom of not video recording all interviews with officers who were present at the scene of a shooting conducted by an officer, (38) the practice or custom of not providing specialized training for investigators conducting officer involved shootings, (39) the practice or custom of

14

not investigating the tactics and decision making of all officers, dispatchers, and supervisors, including but not limited to communication, less lethal options, and de-escalation, (40) the practice or custom of not establishing or utilizing a board to investigate shootings by officers that includes a command staff, a sworn officer one rank higher than the involved officer, a peer officer, and at least one citizen, (41) the practice or custom of not publishing the following directions, "It is their duty as officers to hold the highest regard for the sanctity of human life and that the application of deadly force is a measure to be employed only in the most extreme circumstances after all lessor methods of force have failed or could not be reasonably employed. The primary duty of all officers is to preserve human life." on a web site accessible to all officers carrying a shooting weapon, (42) the practice or custom of not making the information addressed immediately above, accessible to the public on that web site within 72 hours of an officer involved shooting, ( 43) the practice or custom of not having its officers who respond to 911 calls, wear functioning body worn cameras and utilizing them to record the officer's complete response to the 911 calls, (44) the practice or custom of failing to ascertain the levels of maturity and judgment possessed by officers before unleashing them upon the public with lethal weapon, especially when sending white officers into an area populated by minority populations, especially areas populated with blacks. (45) the practice or custom of failing to train officers to utilize proper judgment when  dealing with members of the public, especially areas populated by blacks, before sending them into such areas while possessing lethal weapons, (46) the practice or custom of dispatchers failing to ascertain the identity of the person calling 991, and failing to convey that information to the officers dispatched to the scene, and/or to convey to the responding officers the identity of the person or persons disclosed to the dispatcher as the source of the problem resulting in the 911call, (47) the practice or custom of not training police officers confronting an individual holding a knife in proper edged weapon defense, to deflect or delay the use of the knife to control it and/or remove it from the attacker's grasp..

(Please note that many of the above describe practices or customs are set forth in an assessment of deadly force conducted by members of the Philadelphia Police Department, sponsored by the U. S. Department of Justice.)

The use of these, and other, official policies and/or governmental customs deprived the plaintiffs of their Constitutional Rights, such as: (1) their rights to life and liberty, and (2) their right pursuant to the First Amendment, to petition the government for redress of their grievances against the defendants, (3) their rights to equal protection and due process of the law pursuant to the Fourth, Fifth and Fourteenth Amendments, to due process and equal protection under the law.

15

39. The implementation of these official policies and/or governmental customs caused all the damages requested in this Amended Complaint.

AS AND FOR A SIXTH CAUSE OF ACTION AGAINST THE INSTITUTIONAL DEFENDANTS FOR DEPRIVATION OF PLAINTIFFS' CONSTITUTIONAL RIGHTS PURSUANT TO 42 USC 1983

40. Plaintiff repeats and re-alleges all allegations made heretofore in this Amended Complaint.

41. On information and belief the institutional defendants performed deliberately indifferent training, of its police employees, creating in those employees, a deliberate indifference to the federal constitutional rights of persons with whom the institutional defendants' employees interact. Specifically the City of Rochester and the RPD trained officer Book, in a manner to create in officer Book an indifference to the federal constitutional rights of persons, such as Hayden. That training was a proximate cause of Book's indifference to the constitutional rights of persons such at Hayden, resulting in Book's shooting and killing Hayden.

The institutional defendants' training of the individual defendants was deliberately indifferent, and that policy is the proximate cause of the violations of the plaintiffs federal rights set forth in this Complaint. The RPD did not adequately supervise and train its police officers in the conduct of the investigations of cases involving the civil rights of members of the public.

42. The plaintiffs' damages as a result of the actions described in the Cause of Action, are all the damages previously set forth in this Amended Complaint.

AS AND FOR A SEVENTH CAUSE OF ACTION, WRONGFUL DEATH

43. The plaintiff repeats all allegations made heretofore in this Complaint.

44. The plaintiff's decedent died as a result of the wrongful conduct of defendants Book and Williamson as described heretofore in this Amended Complaint.

16

45. The defendants' actions, as described heretofore in this Amended Complaint, gave rise to a cause of action which could have been maintained, at the moment of plaintiff's decedent's death had he survived, if his death had not ensued. The plaintiff's decedent was survived by one distributee who suffers pecuniary loss by reason of his death; that distributee being plaintiff Roxanne Williams, the executrix of plaintiff decedent's estate.

46. The amount of damages in this cause of action exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction in this matter.

47. The institutional defendants are responsible for the economic loss to Roxanne Williams through the theory of respondeat superior, as his death was committed by Book and Williamson during the course of their employment.

48. Additionally plaintiff's decedent endured conscious pain and suffering between the time he was shot by Book, at 11:38 pm on October 13, 2011, and the time of his death. He was declared dead at 12:30 am on October 14, 2014.

49. Additionally, plaintiffs' decedents' damages as a result of the actions described in the Cause of Action, are all the damages previously set forth in this Amended Complaint.

AS AND FOR AN EIGHTH CAUSE OF ACTION, ASSAULT

50. The plaintiff repeats all allegations made heretofore in this Complaint.

51. On 10-13-11 near midnight, defendants, specifically officer Book, and the City, through officer Book, assaulted the plaintiff's decedent by intentionally placing him in apprehension of imminent harmful or offensive contact, as set forth in this Complaint, including, but not limited to, officer Book pointing a .45 caliber weapon at plaintiff's decedent, and, while crouched in a threatening, shooting posture, needlessly immediately began repeating commands that Hayden (who had called the police for help in dealing with a family disturbance)  drop the knife

52. All actions described in this Cause of Action were committed intentionally and maliciously, or as the result of reckless disregard for the life of Hayden, and otherwise support the award of punitive damages against all the individual defendants who committed those acts.

17

53. Additionally, plaintiffs' decedents' damages as a result of the actions described in the Cause of Action, are all the damages previously set forth in this Amended Complaint.

## AS AND FOR A NINTH CAUSE OF ACTION BATTERY

54. The plaintiff repeats all allegations made heretofore in this Complaint.

55. Defendant's police officer employees, specifically officer Book, on 10-13-11 intentionally and maliciously battered plaintiff's decedent, as set forth in this Complaint, including, but not limited to, shooting the decedent with four bullets into his torso. (Three in his back, two of which went through his heart, as well, and one in his front that traversed Hayden's body from right to left.)

Thereafter defendants Book and Williamson battered plaintiff's decedent, plaintiff herself and plaintiff's daughter T. R, by handcuffing them, and forcing them all to lay on the floor of their apartment. (While depriving Hayden of life saving medical assistance) Thereafter defendant police officers including Book, Williamson and other police officers further battered plaintiff, and her daughter T. R.by forcing them into police vehicles, transporting them to the Public Safety Building and forcing them to remain in isolated rooms and interrogating them for hours.

All actions described in this Cause of Action were committed intentionally and maliciously, and otherwise support the award of punitive damages against all the individual defendants who committed those acts.

56. Additionally, the plaintiffs' damages as a result of the actions described in the Cause of Action, consist of all the damages previously set forth in this Amended Complaint.

## AS AND FOR A TENTH CAUSE OF ACTION FALSE IMPRISONMENT

57. The plaintiff repeats all allegations made heretofore in this Complaint.

58. The defendant's thereafter, on 10-13-11 and 10-14-11 intentionally and maliciously falsely imprisoned plaintiff, and her daughter T. R.by, (as noted in the paragraph immediately above) forcing them into police vehicles, handcuffing them, and transporting them to the Public Safety Building where they were forced to remain isolated, and interrogated for hours.

All actions described in this Cause of Action were committed intentionally and maliciously, and otherwise support the award of punitive damages against all the individual defendants who committed those acts.

59. Additionally, the damages as a result of the actions described in the Cause of Action, consist of the damages previously set forth in this Amended Complaint endured by Roxanne and T.R..

AS AND FOR AN ELEVENTH CAUSE OF ACTION NEGLIGENT INVESTIGATION, TRAINING, AND/OR RETENTION OF EMPLOYEE

60. The plaintiff repeats all allegations made heretofore in this Complaint.

61. On information and belief the defendants RPD and City of Rochester negligently failed to properly investigate the defendant officers involved in the mistreatment of the plaintiff, as heretofore described in this Complaint before hiring them, negligently instructed, negligently trained and negligently supervised them, resulting in the tortuous and other actionable behavior heretofore described in this Complaint.

62. On information and belief Defendants City of Rochester and the RPD, failed to use reasonable care when hiring, training, and supervising officer Book, making Book incompetent to do his work as a police officer without danger of harm to others, such as Hayden.

19

63. Book was incompetent to act as a police officer, under circumstances that existed at the 181 Columbia Avenue Rochester upper apartment on 10-13-11 between 11:30 pm and midnight.

64. The plaintiffs suffered all the damages set forth in this Complaint as a result of the violations described in this Cause of Action.

AS AND FOR A TWELVTH CAUSE OF ACTION AGAINST BOOK, AND INSTITIONAL DEFENDANTS FOR THE NEGLIGENT SHOOTING AND KILLING OF PLAINTIFF"S DECEDENT

65. The plaintiff repeats all allegations made heretofore in this Complaint.

66. Book shot and killed plaintiff's decedent under his negligent misunderstanding that Hayden constituted a threat to the safety of Book or of another person, creating the damages to plaintiffs described heretofore in this Amended Complaint.

AS AND FOR A THIRTEENTH CAUSE OF ACTION AGAINST BOOK, AND INSTITIONAL DEFENDANTS FOR GROSS NEGLIGENCE OR WILFUL MISCONDUCT WHEN SHOOTING AND KILLING OF PLAINTIFF"S DECEDENT

67. The plaintiff repeats all allegations made heretofore in this Complaint.

68. During the time Book shot and killed Hayden, Book failed to use even slight care, and was so careless as to show complete disregard for the rights and safety of Hayden, and T. R. Also when Book shot Hayden he did so knowing his conduct would probably result in injury and/or death to Hayden and/or to T. R.  The shooting of Hayden by Book was conducted in such a reckless a manner as to demonstrate disregard of the consequences of his acts, creating the damages to the plaintiffs described heretofore in this Amended Complaint.

PUNITIVE DAMAGES

69. Plaintiffs are entitled to punitive damages for all the causes of action set forth in this

Amended Complaint, including the Causes of Action brought pursuant to New York State Law,

and under 42 USC 1983. The defendants' behaviors were performed by evil motive, or intent, or

by reckless or callous indifference of the federally protected rights of others.

WHEREFORE, plaintiff demands judgment against the defendants for all the

physical, emotional, financial and other damages plaintiffs endured and will endure in the future,

and for punitive damages against the individual defendants, and for plaintiffs' legal fees, together

with the costs, and disbursements of this action.

May 11, 2015

S/_____

E. ROBERT FUSSELL ESQ.

46 Wolcott Street, Suite One

Le Roy New York 14482

585 768 2240

gasholic@rochester.rr.com